UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:17-cv-464

| | | |
|---|---|---|
| NANCY TROUTMAN and<br>WILLIAM JAMISON, | )<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| Vs. | )<br>) | ORDER |
| QBE INSURANCE CORPORATION, | )<br>)<br>) | |
| Defendant. | ) | |

**THIS MATTER** is before the court on plaintiff's Motion for Partial Summary Judgment (#16), defendant's Motion for Summary Judgment (#20), and the parties' Joint Motion for Continuance of Trial Setting (#29). Having considered the parties' motions and reviewed the pleadings, the court enters the following Order.

### I. Background

On or about October 23, 2015, plaintiffs experienced a significant water and sewage intrusion into their home due to a broken sewer lateral leading to their property. The sewer lateral in question was located in the street and off the plaintiffs' property. Companies involved with installing a fiber optic network in and around the Charlotte area engaged in underground boring and struck the sewer lateral. As a result, a large amount of water, sewage, and other materials entered plaintiffs' home through a downstairs toilet.

Plaintiffs contacted representatives from companies involved, in order to request that they remediate the damage to the home and pay for all necessary repairs. During this process, plaintiffs were informed that remaining in the home was hazardous to their health and the health of their

teenage daughter, and were advised on October 25, 2015 to vacate the property until cleanup and necessary repairs were completed.

The same day, plaintiffs contacted defendant to report a claim pursuant to their homeowners insurance policy. On October 26, 2015, plaintiffs were advised that defendant would pay for them to stay in a hotel due to the damage to the home. In accepting the claim, defendant also agreed to provide plaintiffs with additional living expenses pursuant to the policy. The next day, defendant sent letters to plaintiffs confirming the coverage on their policy.

Over the next several months, plaintiffs attempted to resolve their claim with the companies involved in striking the sewer lateral, but were unsuccessful in reaching an agreement. During these negotiations, defendant continued paying plaintiffs' hotel expenses. Defendant provided additional authorization to the plaintiffs' hotel multiple times over the next several months, and paid a total of $33,143.73 for plaintiffs' hotel expenses.

However, on March 15, 2016, defendant sent an email to plaintiffs indicating that the policy only provided benefits for the length of time that it takes to make repairs to the home, and that sufficient time had elapsed for repairs to be completed. As a result, defendant would not pay for plaintiffs' hotel beyond April 1, 2016. Plaintiffs contacted defendant via phone on March 16, 2016, and were informed that their claim was subject to an endorsement on the policy that limited total coverage for their claim to $10,000. On March 18, 2016, plaintiffs again spoke to defendant, and defendant agreed to pay for hotel expenses through May 1, 2016. On March 24, 2016, after reviewing photographs and a work order from the City of Charlotte showing what repairs had been made, defendant confirmed with plaintiffs that coverage for the loss was limited to $10,000 due to the endorsement and that defendant would not pay for any hotel expenses beyond May 1, 2016.

Plaintiffs proceeded to hire counsel in April of 2016. Plaintiffs' counsel sent a letter to defendant on April 27, 2016, asking for defendant to review their denial of additional benefits for hotel expenses and that it agree to pay for repairs to plaintiffs' home, given that the companies involved appeared unwilling to do so. Defendant responded via letter on May 5, 2016, stating that its investigation showed that the sewer issue happened off the premises of plaintiffs' home and reasserted that plaintiffs' claim was subject to an endorsement limiting coverage for the loss to $10,000. Defendant also indicated in the letter than any additional claims related to this loss were denied and that defendant was closing its file.

Plaintiffs proceeded to file suit in August of 2016, against defendant and the companies involved with breaking the sewer lateral, with the City of Charlotte later added as a third party defendant. Claims with other parties were resolved and dismissed from this action on August 3, 2017. On August 4, 2017, defendant removed this matter to this court pursuant to diversity jurisdiction under 28 U.S.C. § 1332(a) and (c). Essentially, plaintiffs allege that their homeowner's policy, provided through defendant, is not subject to the endorsement limiting their claim to $10,000 and move for summary judgment on this issue. Defendant argues that the endorsement is valid and applicable to plaintiffs' situation, and that plaintiffs' other allegations, specifically bad faith and unfair and deceptive trade practices claims, fail as a matter of law.

**II.     Legal Standard**

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A

fact is material only if it may affect the suit's outcome under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). The burden then shifts to the nonmoving party. That party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in pleadings to defeat a motion for summary judgment. Id. at 324. Instead, that party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

The Court views evidence and any inferences from evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The question posed by summary judgment is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252.

Where insurance policies are concerned, the courts of the State of North Carolina have long held that insurance policy provisions should be "construed liberally so as to provide coverage, whenever possible by reasonable construction." State Capital Ins. Co. v. Nationwide Mut. Ins. Co., 318 N.C. 534, 539 (1986) (citing Moore v. Hartford Fire Ins. Co., 270 N.C. 532 (1967)). The effect is to broaden coverage available to the insured, such that "provisions which exclude liability of

insurance companies are not favored and therefore all ambiguous provisions will be construed against the insurer and in favor of the insured." Id. (citing Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 276 N.C. 348 (1970)).

When interpreting a policy's language and terms, "[i]f no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." Woods v. Nationwide Mut. Ins. Co., 295 N.C. 500, 506 (1978). Should words or provisions be ambiguous or "capable of several reasonable interpretations, the doubts will be resolved against the insurance company and in favor of the policyholder." Id. In determining the meaning of a policy's terms, the court must strive for consistency, and ensure that the "various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect." Id. Finally, determining the meaning of policy language is a question of law for the court. Wachovia, 276 N.C. at 354 (citations omitted).

**III.     Discussion**

The court has reviewed the parties' pleadings and the rest of the record. Plaintiff makes three claims against defendant in their Complaint (#1-1): breach of contract, bad faith, and unfair and deceptive trade practices, all based on plaintiffs' homeowners insurance policy with defendant. The court will consider plaintiffs' claims in turn.

1. *Plaintiffs' breach of contract claim*

First, the court will consider plaintiffs' breach of contract claim. The relevant portions of the insurance policy are as follows:

**HOMEOWNERS 3 – SPECIAL FORM**
**SECTION I – EXCLUSIONS**

**A.** We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

…

    **3. Water**
    This means:
**a.** Flood, surface water, waves, including tidal wave and tsunami, tides, tidal wave, overflow of any body of water, or spray from any of these, all whether or not driven by wind, including storm surge;
    **b.** Water which:
    (1) Backs up through sewers or drains; or
    (2) Overflows or is otherwise discharged from a sump, sump pump or related equipment;
**c.** Water below the surface of the ground, including water which exerts pressure on, or seeps, leaks or flows through a building, sidewalk, driveway, patio, foundation, swimming pool or other structure; or
**d.** Waterborne material carried or otherwise moved by any of the water referred to in **A.3.a.** through **A.3.c.** of this exclusion.

This Exclusion **A.3.** applies regardless of whether any of the above, in **A.3.a.** through **A.3.d.,** is caused by an act of nature or is otherwise caused.

This Exclusion **A.3.** applies to, but is not limited to, escape, overflow or discharge, for any reason, of water or waterborne material from a dam, levee, seawall or any other boundary or containment system.

\*\*\*\*\*
HO 32 32 06 124

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY
**SPECIAL PROVISIONS – NORTH CAROLINA**
**SECTION I – EXCLUSIONS**

Paragraph 3. Water is replaced by the following:

**3. Water**
This means:
    **a.** Flood, including but not limited to flash flood, surface water, waves,

including tidal wave and tsunami, seiche, tides, tidal wave, overflow of any body of water, or spray from any of these, all whether or not driven by wind, including storm surge;
**b.** Water which:
**(1)** Backs up through sewers or drains; or
**(2)** Overflows or is otherwise discharged from a sump, sump pump or related equipment;
**c.** Water below the surface of the ground, including water which exerts pressure on, or seeps, leaks or flows through a building, sidewalk, driveway, patio, foundation, swimming pool or other structure; or
**d.** Waterborne material carried or otherwise moved by any of the water referred to in **3.a.** through **3.c.** of this exclusion.

This Exclusion **3.** applies regardless of whether any of the above, in **3.a.** through **3.d.,** is caused by an act of nature, an act of man or is otherwise caused.

This Exclusion **3.** applies to, but is not limited to, escape, overflow or discharge, for any reason, of water or waterborne material from a dam, levee, seawall or any other boundary or containment system whether natural, man-made or is otherwise made.

\*\*\*\*\*
HO 04 84 06 12

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY
**LIMITED WATER BACK-UP AND SUMP DISCHARGE OR OVERFLOW COVERAGE – NORTH CAROLINA**
**Limited Water Back-up and Sump Discharge or Overflow Limit of Liability: $10,000**

**A. Section I – Property Coverages**
The following coverage is added:

We will pay up to the Limit of Liability shown in the Schedule for direct physical loss, not caused by the negligence of an "insured", to property coverage under Section I, caused by water, or waterborne material, which:

    **1.** Originates from within your dwelling where you reside and backs up through sewers or drains; or
    **2.** Overflows or is discharged from a:
    **a.** Sump, sump pump; or
    **b.** Related equipment;

even if such overflow or discharge results from mechanical breakdown. This coverage does not apply to direct physical loss of the sump pump, or related equipment, which is caused by mechanical breakdown.

This endorsement does not increase the amount of insurance that applies to the covered property.

…

**C. Section I – Exclusions**

The **Water** Exclusion is replaced by the following:

> **Water**
> This means:
> **1.** Flood, including but not limited to flash flood surface water, waves, including tidal wave and tsunami, seiche, tides, tidal wave, overflow of any body of water, or spray from any of these, all whether or not driven by wind, including stor surge;
> **2.** Water which:
> **(a)** Backs ups through sewers or drains; or
> **(b)** Overflows or is otherwise discharged from a sump, sump pump or related equipment;
> As a direct or indirect result of flood.
> **3.** Water below the surface of the ground, including water which exerts pressure on, or seeps, leaks or flows through a building, sidewalk, driveway, patio, foundation, swimming pool or other structure; or
> **4.** Waterborne material carried or otherwise moved by any of the water referred to in **C.l.** through **C.3.** of this exclusion.

This Exclusion applies regardless of whether any of the above, in **C.1.** through **C.4.,** is caused by an act of nature, an act of man or is otherwise caused.

See Exh. I-K.

Plaintiffs argue that defendant has incorrectly applied the above policy to their situation, and in doing so wrongly denied them coverage. It is undisputed that plaintiffs' loss was caused by water (and materials within the water) that overflowed into their house and caused widespread damage. It is also undisputed that the overflow was caused by the aforementioned contractors who struck the sewer lateral off the plaintiffs' property. The dispute mainly lies with how to properly

apply the endorsements and modifications to the original policy, as well as issues over how to interpret the term "originates" in the context of the policy as a whole.

Here, the court finds that the policy language does not extend the full coverage to plaintiffs' claim. Again, the court must interpret policy terms consistently, and ensure that the "various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect." Woods, 295 N.C. at 506. While any ambiguities are to be resolved against the insurer, the court cannot ignore elements of the policy if doing so is inconsistent with the policy as a whole. Id. Interpreting the coverage afforded by the policy in this matter shows that an on-premises event would have been covered up to the maximum desired by plaintiffs, as the policy describes coverage for water damages and overflow resulting from problems within the plumbing system itself, as well as covering overflows due to off-premises events if not otherwise excluded. However, the water exclusion in question does describe water overflowing due to off-premises events, and the overflow here was caused by an off-premises event; as such, it is firmly in the realm of exclusion.

Furthermore, such an interpretation gives cogent effect to the terms of the policy and construes them broadly in favor of coverage, in that on-premises events are covered fully and off-premises events can be covered to a certain extent. Indeed, a wide array of courts, including colleagues of this court, have considered similar policies and provisions in comparable situations and arrived at the same conclusion. See Pichel v. Dryden Mut. Ins. Co., 117 A.D.3d 1267, 1269 (N.Y. App. 2014) ("[W]ater damage caused by a backup/overflow that originates from a pipe or clogged drain located within the insured's property line comes from the insured's plumbing system and is covered by the policy; conversely, if the cause of the backup/overflow is from outside the

insured's property boundaries . . . the sewer or drain exclusion is applicable."); Jackson v. American Mut. Fire Ins. Co., 299 F.Supp. 151, 156 (M.D.N.C. 1968) ("No conflict is found between the two clauses. The insuring clause insures generally against loss caused by the accidental discharge or overflow of water from within the plumbing system. Without the 'special exclusions,' this clause would insure against any loss caused by such overflow from within the plumbing system. However, the provisions under clause (b) of the special exclusions limits this coverage by excepting overflow caused by certain outside forces."); For Kids Only Dev. Ctr., Inc. v. Philadelphia Indem. Ins. Co., 260 S.W.3d 652 (Tex. App. 2008) (holding that the policy excluded loss or damage caused by water backing up or overflowing from a sewer and instead used an endorsement to provide additional coverage); Drutz v. Scottsdale Ins. Co., 2012 WL 665984 (D. Md. Feb. 28, 2012); Montelone v. The Auto Club Grp., 113 F. Supp. 3d 950, 959 (E.D. Mich. 2015); Cheetham v. S. Oak Ins. Co., 114 So.3d 257, 263 (Fla Dist. Ct. App. 2013).

As is, the court finds that plaintiffs' losses would normally be excluded under the policy as water and waterborne materials overflowing to damage plaintiffs' property. However, defendant was required to find coverage for plaintiffs' loss, if possible, by reasonable construction of the policy language. N. Carolina Farm Bureau Mut. Ins. Co. v. Stox, 412 S.E.2d 318, 321 (N.C. 1992) (citation omitted). Defendant has done so by using the Limited Water Backup Endorsement to provide what coverage they could for plaintiff's losses. Further, the court does not agree with plaintiffs' contention on the meaning of the word "originates" in the policy, and finds instead that "originates" refers to the point of entry in the residence, rather than any indication of the location of the underlying cause. Interpreting the word otherwise would impact the scope of coverage provided by the endorsement, which the endorsement explicitly disavows. Conversely,

interpreting "originates" as the point of entry in the residence is consistent with the rest of the policy at large and again reinforces the principle of providing as broad coverage as possible overall. See Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co., 172 S.E.2d 518, 522 (N.C. 1970) (holding that when a term's immediate context "is not clearly indicative of the meaning intended, resort may be had to other portions of the policy and all clauses of it are to be construed, if possible, so as to bring them into harmony"). Finally, plaintiffs' argument that definitions in the limited endorsement supersede those of the original policy is unavailing. Such wholesale replacement of terms of the base policy by an expressly "limited" coverage that provides a highly specific sublimit defies the clear intent of the limited endorsement and cannot be read to supersede the original policy in its entirety. As such, the court finds that defendant has properly interpreted and applied the aforementioned insurance policy to plaintiffs' situation under North Carolina law. In doing so, defendant is thus entitled to summary judgment on plaintiff's breach of contract claim.

2. *Plaintiffs' bad faith claim*

Next, the court will consider plaintiffs' common law bad faith claim. To recover for a bad faith claim in an insurance context, plaintiff must establish "1) a refusal to pay after recognition of a valid claim; 2) bad faith; and 3) aggravating or outrageous conduct." Blis Day Spa, LLC v. Hartford Ins. Grp., 427 F.Supp.2d 621, 631 (W.D.N.C. 2006) (citation and corresponding quotation marks omitted). Bad faith is defined as "not based on honest disagreement or innocent mistake." Dailey v. Integon Gen. Ins. Corp., 331 S.E.2d 148, 155 (N.C. App. 1985). Aggravated conduct is defined as including "fraud, malice, gross negligence, insult . . . willfully, or under circumstances of rudeness or oppression, or in a manner which evinces a reckless or wanton disregard of the plaintiff's rights." Id. at 154.

Based on the Court's resolution of plaintiffs' breach of contract claim, this cause of action is no longer viable the disputed amounts herein were not recognized as valid. It is undisputed that defendant has actually paid all the losses it is required to pay under the Policy, in the amount of $10,000.00 as discussed above. Thus, summary judgment is appropriate on this claim inasmuch as the first element on insurance bad faith claim was is not satisfied where the insurer paid the undisputed portion of claim and refused to pay remaining amounts claimed which were never recognized as valid. Blis Day Spa, 427 F. Supp. 2d at 631. The Court has, however, reviewed the substantive arguments, as follows.

Plaintiff first argues that defendant failed to properly train and supervise its adjusters, and that doing so constitutes an issue of material fact for a bad faith claim. Essentially, plaintiffs argue that defendant apparently failed to instruct its claim adjusters and supervisors in the language they would encounter in the policy and endorsements set out above. However, the court cannot agree.

First, claims based on lack of training and specialized knowledge in a profession are the kind where expert testimony would have proved useful, as adjusting claims involves "highly specialized knowledge with respect to which a layman can have no reliable information." Mazza v. Huffaker, 300 S.E.2d 833, 837 (N.C. App. 1983) (quoting Jackson v. Mountain Sanitarium & Asheville Agric. Sch., 67 S.E.2d 57, 61 (N.C. 1951)). It was, however, plaintiff's burden to come forward with such evidence, and the lack of any expert testimony on insurance standards and training leaves the court unable to conclude that a genuine issue of material fact exists on this basis, as without *any* evidence in support of their contention, plaintiffs' lay speculation is insufficient to survive summary judgment. Even if this area is an exception to the rule, to wit, one where "common knowledge and experience of the [fact finder] is sufficient to evaluate compliance

with a standard of care," that exception applies only when conduct is so grossly negligent that lay knowledge is sufficient to "make obvious the shortcomings of the professional." <u>Delta Envtl. Consultants of N.C., Inc. v. Wysong & Miles Co.</u>, 510 S.E.2d 690, 695 (N.C. App. 1999). This is not such a case. Left without expert opinion concerning the expected training and knowledge of adjusters and the standards in the industry, the only reasonable inferences which can be drawn are that, like in all professions, there are some adjusters whose knowledge is encyclopedic and some whose knowledge is non-existent, with the vast majority of adjusters falling somewhere in between. Likewise, the Court concludes that there are likely hundreds if not thousands of standard endorsements which can be applied to an equally large number of insurance products. Based on the evidence now before the Court, it cannot find that that a lack of specific knowledge or training on two endorsements, without more, is sufficient to show the "gross negligence" that is required for a finding in favor of plaintiffs on a bad faith claim.

Plaintiffs next argue that defendant willfully disregarded the express language of the policy to reach its coverage position. As outlined above in analyzing plaintiffs' breach of contract claim, the court cannot find that defendant willfully disregarded the language of the policy; indeed, defendant's interpretation is consistent with both the policy as a whole and with North Carolina law. As such, the court cannot find an issue of material fact exists on this basis.

Plaintiffs further argue that defendant willfully applied the inappropriate definition of "water" in order to avoid coverage. Plaintiffs' arguments are identical to those in their breach of contract claim and their contentions that defendant disregarded policy language. For similar reasons as set out above, the court finds that defendant did not apply the inappropriate definition

of "water," and in fact applied the water exclusions and endorsements properly under North Carolina law. Therefore, the court cannot find an issue of material fact exists on this basis.

Plaintiffs also argue that defendant's investigation was untimely. However, the record reflects that defendant sent an adjuster to investigate plaintiffs' loss days after the sewer back up and began paying plaintiffs the coverage provided under the policy at around the same time. Defendant also promptly responded to communications from plaintiffs and plaintiffs' counsel. As such, the court cannot find an issue of material fact for bad faith on this basis.

Plaintiffs next argue that defendant denied plaintiffs' claim prior to completing an investigation. Plaintiff points to interactions in March 2016 for support. On March 16, 2016, a representative of defendant informed plaintiffs that their claim was denied due to the $10,000 liability limit in the subject endorsement. But plaintiff also points out that a week later, on March 23, 2016, defendant sent an adjuster to request additional information from plaintiffs to determine if the loss occurred on or off the premises. In doing so, plaintiffs argue that defendant demonstrated an egregious lack of care that supports a bad faith claim.

The court cannot agree. Had the March 23 information request been defendant's only investigation into the origin of the backup, plaintiffs' argument may have merit. However, defendant had already investigated the origin of the damage as a sewer lateral off of plaintiffs' property, which formed the basis of defendant's denial of further coverage. Defendant going back to double check their findings later cannot be said to create an issue capable of surviving summary judgment, particularly when the additional information requested only echoed what defendant had already determined. The court thus cannot find an issue of material fact for a bad faith claim exists on this basis.

Plaintiffs then argue that defendant willfully misrepresented the terms of the policy to plaintiffs in their denial letter. Plaintiffs contend that defendant's letter provided that the sewer back up occurred off premises, but then quoted policy language stating that a $10,000 limit applies to claims where water originated from within the dwelling; plaintiffs argue these statements are at odds with each other. As outlined above in analyzing plaintiffs' breach of contract claim, the court does not find these statements to be contradictory or a misrepresentation. Again, "originates" refers simply to the point of entry in the dwelling, and not some specific place of cause. The back-up occurring off premises and the water originating from the toilet are not contradictory statements and cannot be said to be a willful misrepresentation. As such, the court cannot find that an issue of material fact for a bad faith claim exists on this basis.

Plaintiffs also argue that defendant failed to seek advice of counsel. Plaintiffs contend that failing to consult counsel on a contested matter demonstrates recklessness that shows bad faith. However, plaintiffs fail to offer any sort of case law or statutory guidance showing that this is a sufficient issue of material fact for a bad faith claim. Indeed, the only support for plaintiff's contention that defendant's action was reckless is plaintiff's own speculation, and speculation is insufficient to survive summary judgment. As such, the court cannot find an issue of material fact for a bad faith claim exists on this basis.

Plaintiffs next argue that defendant failed to follow its own guidelines on handling claims, in that defendant's guidelines state that an associate vice president must review denial letters before they are sent. While it is true that Associate Vice President Greg Blaska could not recall reviewing the May 5 denial letter before it was sent, he had already reviewed, approved, and signed off on defendant's coverage position well before the May 5 letter was sent to plaintiffs. Furthermore,

plaintiffs once again offer no case law or statutory support for its contention that a company departing from internal guidelines can justify a bad faith claim. The court thus cannot find an issue of material fact for a bad faith claim exists on this basis.

Finally, plaintiffs argue that defendant changed its position once it appeared that a larger claim would be asserted. Plaintiffs contend that, at the outset of the claim, defendant agreed to pay up to the $65,700 limit for Coverage D, and did not mention the endorsement or discuss a potential limit of $10,000 until March 2016, when their claim was denied. Plaintiffs argue that this position change was a result of defendant learning that plaintiffs would not be able to settle their claim against the tortfeasors. However, after reviewing the record, the court cannot agree. It is undisputed that plaintiffs were still negotiating with the tortfeasors until at least March 29, 2016, two weeks after defendant had already denied plaintiffs' claim and informed plaintiffs of the coverage decision. As such, the court cannot find any issue of material fact for a bad faith claim on this basis.

Ultimately, plaintiffs have failed to offer any viable issue of material fact for trial on their common law bad faith claim. As such, the court finds that defendant is also entitled to summary judgment on this count.

3. *Plaintiffs' unfair and deceptive trade practices claim*

Finally, the court will consider plaintiffs' unfair and deceptive trade practices claim. To establish such a claim under N.C. Gen. Stat. § 75-1.1(a), plaintiffs must show (1) an unfair or deceptive act or practice (2) in or affecting commerce (3) which proximately caused injury to plaintiffs. See Gray v. N. Carolina Ins. Underwriting Ass'n, 529 S.E.2d 676, 681 (N.C. 2000). Whether an act or practice is unfair or deceptive is a question of law for the court. See Ellis v.

Northern Star Co., 388 S.E.2d 127, 131 (N.C. 1990). A practice is unfair and deceptive "when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Marshall v. Miller, 276 S.E.2d 397, 403 (N.C. 1981). A violation of North Carolina's Unfair Claims and Settlement Practices Act, N.C. Gen. Stat. § 58-63-15(11), can be used as a measuring stick for an insurer's unfair and/or deceptive conduct. Gray, 529 S.E.2d at 683.

Once again, the court cannot find an issue of material fact for trial on this issue. As the court has already found that defendant did not breach their contract with plaintiffs, defendant can hardly be said to have misrepresented the terms of coverage or otherwise been unfair or deceptive about them. The record reflects that defendant regularly communicated with plaintiffs about their coverage and their stance on that coverage via phone and email. Further, plaintiffs' arguments that defendant was slow to respond are unavailing, for similar reasons to those outlined above in analyzing plaintiffs' bad faith claim. Defendant sent an adjuster to investigate plaintiffs' loss days after the sewer back up and began paying plaintiffs the coverage provided under the policy at around the same time. Defendant also promptly responded to communications from plaintiffs and plaintiffs' counsel. As such, the court cannot find an issue of material fact for any potential unfair and deceptive acts on the part of defendant.

Finally, the court also notes that plaintiffs do not appear capable of satisfying the third prong of proximate cause of injury. Under North Carolina law, the sewer backup caused plaintiff's harm, not defendant's alleged misconduct, and any misrepresentations or lack of action cannot be said to satisfy the proximate cause prong. See Burrell v. Sparkkles Reconstruction Co., 657 S.E.2d 712, 717 (N.C. App. 2008) (holding that an insurance company's alleged misconduct and delays

cannot be held to satisfy proximate cause); Nelson v. Hartford Underwriters Ins. Co., 177 N.C. App. 595, 608 (N.C. App. 2006) (holding that defendant's alleged misrepresentations, refusal to pay claims, failure to affirm or deny coverage within a reasonable time, and failure to promptly provide a reasonable explanation of their interpretation all fail to satisfy the proximate cause prong). Therefore, the court also finds that defendant is entitled to summary judgment on plaintiff's unfair and deceptive trade practices claim.

## ORDER

**IT IS, THEREFORE, ORDERED** that plaintiffs' Motion for Partial Summary Judgment (#16) is **DENIED**, defendant's Motion for Summary Judgment (#20) is **GRANTED**, the parties' Joint Motion for Continuance of Trial Setting (#29) is **DENIED as moot** and this matter is **DISMISSED with prejudice**.

Signed: June 6, 2018



Max O. Cogburn Jr
United States District Judge